## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**JUAN BAYOLO,**                                  **CASE NO. 5:19-cv-00403-TKW-MJF**

　　　　**Plaintiff,**

　**v.**

**MHM HEALTH PROFESSIONALS, LLC.**
**f/k/a MHM HEALTH PROFESSIONALS, INC.,**

　　　　**Defendant.**
_____/

## SECOND AMENDED COMPLAINT

Plaintiff, JUAN BAYOLO, hereby sues Defendant, MHM HEALTH PROFESSIONALS, LLC. f/k/a MHM HEALTH PROFESSIONALS, INC., and alleges:

### NATURE OF THE ACTION

1.     This is an action for whistleblower retaliation brought pursuant to §448.102, Fla.Stats., and for discrimination based on an actual or perceived disability and/or record of impairment, for discrimination based on national origin, and for retaliation, brought pursuant to Chapter 760, Fla.Stats.

2.     This action involves claims which are valued, individually, in excess of fifteen thousand dollars ($15,000), exclusive of costs and interest and was removed to this Court by the Defendant.

**PARTIES**

3.     At all times pertinent hereto, Plaintiff, JUAN BAYOLO, has been a resident of Florida and a licensed physician, and was employed by Defendant. Plaintiff is a member of protected classes due to his actual or perceived disability and/or record of impairment, due to his national origin, due to his having reported violations of laws, rules and/or regulations and having been retaliated against thereafter, and due to his having reported adverse employment actions and having been retaliated against thereafter.

4.      Defendant, MHM HEALTH PROFESSIONALS, LLC. f/k/a MHM HEALTH PROFESSIONALS, INC., is a private for-profit health care provider that specializes in providing health care services in jail and prison settings that was conducting business in the state of Florida, at all times pertinent hereto.

**CONDITIONS PRECEDENT**

5.     All conditions precedent to bringing this action have been satisfied or waived.

## GENERAL FACTS

6.      Plaintiff, a physician of Cuban ancestry who suffers from attention

deficit hyperactivity disorder ("ADHD"), began in Defendant's employ on May 22,

2016, and at the time of his wrongful termination, October 20, 2017, held the

position of site medical director/chief health officer of the Northwest Florida

Reception Center ("NFRC"), a location where inmates are housed by the DOC,

located at 4455 Sam Mitchell Drive, Chipley, Florida 32428.

7.      Plaintiff's ADHD condition, which was at all pertinent times known to

Defendant, impacts his major life activity of working. More specifically, Plaintiff has

been prescribed medication to control his anxiety and mental state, and even when

taking such medication, when things in his environment become less orderly, less

systematic or less organized, Plaintiff becomes anxious, even overwhelmed, a

reaction sometimes bordering on a panic attack. This reaction requires Plaintiff, with

the assistance of those with whom he is working, to halt his task for a moment,

metaphorically step back for a moment, reorient himself, and start his task anew.

8.      Plaintiff was at all pertinent times qualified to perform the essential

functions of his position, with or without accommodations for his condition.

9.      As stated above, one or more contacts were in place between the DOC

and Defendant pursuant to which Defendant managed the NFRC, which contract or

contracts are not in Plaintiff's possession. Defendant hired personnel, including Plaintiff, in furtherance of its obligations under such contract or contracts.

10.     Despite Plaintiff's stellar performance during his employment by Defendant, Plaintiff was subjected to disparate treatment due to his national origin, gender, and due to his actual or perceived disability and/or record of impairment. Moreover, Plaintiff was subject to retaliation after he reported discrimination, and after he reported Defendant's actual or suspected violations of laws, rules and/or regulations.

11.     The mistreatment came at the hands of, specifically but not limited to, Tara Johnson, a health service administrator; f/n/u Kent, a nurse; f/n/u Harrel, a nurse; and f/n/u White, also a nurse.

12.     Other employees have been subjected to similar discrimination.  For example, male employees similarly targeted based on their gender have included but have not been limited to Dr. G Lanel, Patrick Parker, John Triglown and Dr. Charles Matthews.  Although other Hispanics were mistreated, Plaintiff was the only of Cuban descent and the only Hispanic physician, and was singled out with offensive comments on this basis.  Plaintiff was made to feel as though he were less of a person due to his impairments.  And Plaintiff was chastised for reporting the mistreatment as if reporting Defendant's violations were more of a crime than the violations themselves.

13.    Generally, regarding Plaintiff's national origin claim, he was repeatedly subject to disparate and discriminatory treatment by way of the use of profanity directed at him and spoken about him, and discriminatory national origin statements. Plaintiff was the only Hispanic physician at the main unit of NFRC. The Health Services Administrator, Tara Johnson, who exercised authority over Plaintiff, wrote to Plaintiff and told him that she did not care about his culture. Johnson also told at least one nurse prior to Plaintiff being fired that she could not wait to get rid of that "spic" referring to Plaintiff. Plaintiff was also treated poorly by other employees supervised by Tara Johnson, who lead them by example in the way that she treated Plaintiff. There was a group of nurses who were working to get rid of a number of Hispanic workers and continued to falsely accused him of being rude, undermined his authority by stating that he was being rude when he was simply trying to do his job, making false accusations against him and refusing to take directions from Plaintiff. He was then falsely accused of putting his hands on a nurse and yelled at when he directed nurses to do their jobs. Johnson and her nurses also hid written documentation of Plaintiff's productivity which adversely affected his employment with Defendant. At least one or more of the nurses under Johnson directed an inmate to report a prison rape against Plaintiff.

14.    Generally, regarding his disability discrimination claim, the nurses working with Plaintiff teased and mocked Plaintiff for his use of medications related

to his disability.  He was asked by the nurses who worked under Tara Johnson whether he forgot to take his medications that day and comments were made about what medications he was on.  False allegations were made against and about Plaintiff regarding not working with the nurses and being condescending to them.  He also received an unwarranted reprimand for inappropriate behavior in the workplace and low productivity, discussed below, after he learned that while he was on vacation, six months of his work was missing and/or had been destroyed.  Plaintiff was never given a chance to refute these allegations against him.  Had he been given that opportunity, Plaintiff would have shown that he was actually exceeding expectations and did not do what he was accused of doing.  He was then falsely accused of putting his hands on a nurse and yelled at when he directed nurses to do their jobs.  Johnson and her nurses also hid written documentation of Plaintiff's productivity which adversely affected his employment with Defendant.  At least one or more of the nurses under Johnson directed an inmate to report a prison rape against Plaintiff.

15.    Most of these nurses and other coworkers of Plaintiff who were working under Johnson would team up against Plaintiff such that he was made to feel like an outsider and as though he did not belong.  They would regularly joke amongst themselves about Plaintiff in negative and harmful ways, almost as if they sought to provoke Plaintiff into acting out in some way to their conduct toward him which became unbearable.  Nonetheless, Plaintiff found a way to carry himself in a

professional manner and continue doing his job the best he could for as long as he could.

16.    On September 29, 2016, Plaintiff reported negligence and violations of law on behalf of Defendant. Specifically, Plaintiff reported that Defendant assigned Plaintiff new patients for evaluation without Plaintiff's prior knowledge; and that it misclassified patients and failed to notify Plaintiff when rapes were reported by inmates, in violation of the federal Prison Rape Elimination Act ("PREA"), 34 U.S.C. §30301, *et seq*. Plaintiff also reported actions by Defendant's nursing staff constituting violations of Florida's Nurse Practice Act, § 464.001, *et seq*., Fla.Stats., including without limitation Paragraphs (1)(j) and (n) of § 464.018, Fla.Stats.

17.    Following his reporting, Defendant took no corrective action, and Plaintiff was targeted with retaliation and subject to increased hostility and heightened criticism.

18.    From Plaintiff's hiring, Defendant has always been aware of his ADHD. Due to this condition, Plaintiff is prescribed daily medications. However, Plaintiff was repeatedly mocked by the nursing staff for his use of medications by, including without limitation, Kent, Harrel, and White. By way of example, employees of the Defendant's nursing staff would regularly ask Plaintiff if he took his medication that day. Despite Plaintiff's reporting to Defendant's upper management regarding this discriminatory behavior, the mistreatment continued.

Furthermore, the nursing staff regularly showed a lack of respect and insubordination toward Plaintiff, who was their supervisor, by way of publicly questioning his medical opinion and directives.

19.    On October 20, 2016, Plaintiff wrote an email to John Lay reporting the continued mistreatment by the nursing staff. Plaintiff specifically informed Lay of the insubordination and lack of teamwork. Lay responded and set up a meeting with Plaintiff to discuss his concerns. However, following his conversation with Lay, the disparate treatment and insubordination continued.

20.    On December 15, 2016, Defendant notified Plaintiff that all of his records of productivity were lost and/or could not be found. Plaintiff immediately emailed Johnson and requested that she call him to discuss the loss of his records. However, Plaintiff never received a call from Johnson to explain the situation. The following day, Plaintiff began a pre-approved vacation.

21.    During his vacation, Plaintiff worked via email. However, Plaintiff received hostile and condescending emails from Johnson. Upon his return from vacation, in or around January 2017, Plaintiff was issued a written "final warning" for profanity use, insufficient productivity in patient care, and a violation of Defendant's code of conduct. Plaintiff responded by providing evidence to prove the allegations of insufficient productivity in patient care was contrived. He also told Johnson that he was not the only person who cussed but was the only one

disciplined.  Johnson verbalized that the warning would remain effective for a period of only six (6) months, and her so stating was also witnessed by her secretary, f/n/u Bush. Moreover, Johnson also verbalized that the reprimand was meant to be downgraded to a verbal warning. Nevertheless, Defendant refused to downgrade the reprimand to a verbal warning. In comparison, numerous similarly situated employees, including American-born and non-disabled employees Kent and Patty Reister, both females, used profanity on the job with no corrective action ever taken. Moreover, Plaintiff received no written or verbal warning prior to this "final warning."

22.    Thereafter, Defendant initiated an investigation into the claims against Plaintiff; however, in the course of such investigation Defendant refused to allow Plaintiff to provide his statement of events.

23.    On February 15, 2017, Plaintiff received an extremely hostile email from Johnson. Johnson stated in the email that Plaintiff was rude and disrespectful during a meeting on February 14, 2017. However, this was a contrived allegation, and witnesses who could contest the falsehoods including f/n/u Rudolph, Defendant's director of nursing. Further, Johnson specifically stated in her email, "I don't care what your culture is, it is not professional behavior." Plaintiff had done nothing wrong.

24.    Moreover, while Johnson informed Plaintiff within the email that the

content thereof was to stay between the two of them only, with repeated emphasis on such confidentiality, Plaintiff later discovered that Johnson had blind copied a third party on said email.

25.    Plaintiff reported the continued disparate treatment on the basis of at least his national origin/race on several occasions to Defendant's upper management with no corrective action taken.

26.    On February 17, 2017, Plaintiff filed a formal complaint regarding the workplace harassment, regarding his discriminatory treatment, and regarding Defendant's continued violation of laws, rules and/or regulations without appropriate corrective action. By way of example, Plaintiff reported nurse Clarissa Cooper's attempt to have Plaintiff use an illegal form for his work duties, which incident occurred on January 3, 2017.  This was reported by Plaintiff in an email to supervisors Daniel Cherry, John Lay and Rhonda McAlpin.  Moreover, Plaintiff requested that a formal investigation into his complaint be initiated.

27.    On March 29, 2017, Plaintiff received a letter indicating that the investigation into his complaint was completed, and his complaints would be appropriately addressed. However, in a conversation with Sarah Brus, Johnson's assistant, Plaintiff was made aware that no corrective action would be taken, and that Johnson's mistreatment would therefore continue unabated.

28.    Plaintiff's complaints had remained ongoing for months despite their

clear ineffectiveness. Ultimately, in light of Defendant's failure to take corrective action and being faced yet again with mistreatment in the form of an offensive slur based on Plaintiff's national origin within an email Plaintiff received from Johnson, in March 2017 Plaintiff was compelled to take his complaints above the purview of his supervisors at NWFRC and make a formal complaint to Defendant's HR and to file a formal charge of discrimination with the EEOC.

29.     In or around May 2017, Plaintiff filed a charge of discrimination with the EEOC regarding the continued disparate and discriminatory treatment based on race and other protected characteristics.

30.     On October 12, 2017, Plaintiff saw a patient for multiple complaints, including but not limited to chest pain, testicular pain, and knee pain. During the visit, the patient informed that he had a bullet lodged in his thigh, and requested that it be removed. Plaintiff completed a thorough physical examination of the patient, ordered that one or more tests be performed, and set a meeting for the following day to discuss the results.

31.     The following day, on October 13, 2017, Plaintiff began his normal morning routine. Shortly thereafter he received the results of tests administered to the above-mentioned patient, and planned to discuss those results with the patient later that day, along with his plan of care to remove the bullet.

32.     That morning, October 13, 207, after Plaintiff got to work and while he

was viewing a specimen through a microscope, he was approached from behind by Nurse Kent.  Plaintiff immediately felt threatened and that her actions violated his personal space, particularly when she placed her breasts on his back and proceeded to ask Plaintiff what he was looking for and if he would show her.  Plaintiff asked Kent to please respect his personal space and to step back, which immediately caused Kent to respond in a hostile or otherwise negative manner.  As Plaintiff reported verbally to his supervisors at work that day and in writing days later by describing how this incident "was very uncomfortable for [Plaintiff] and at the time [Plaintiff] decided to continue with [his] day and properly address it later."  This was among the incidents and violations Plaintiff was never afforded the opportunity to fully present his statement of events up his chain of command as he was quickly terminated just days later on October 20, 2017.

33.   Later that day, October 13, 2017, an employee of the nursing staff questioned if Plaintiff was feeling alright, to which Plaintiff responded no, as he had worked for forty (40) consecutive hours and also had dealt with a family emergency that same morning. However, Plaintiff verbalized that he was excited to see the patient mentioned above when he came in.

34.   A member of the nursing staff subsequently informed Plaintiff that he would not be allowed to see the patient or perform any care on him. When Plaintiff questioned him, the nursing staff member responded that he had been present for

some or all of a meeting with Johnson that morning at which Johnson had stated that Plaintiff was not allowed to perform any care on said patient. Moreover, Johnson had stated in such meeting that she had spoken with the warden, and that he had directed that foreign body removal was not allowed.

35.    Being the institutional medical director ("IMD"), Plaintiff was surprised that Johnson did not approach him to address the situation, as Defendant's policy and procedures stated that authority devolved upon the IMD to exercise his or her final clinical judgment concerning the delivery of medical care to patients. When Plaintiff asked the nurse if he knew when this decision was made, the nurse responded that it was only put in palace approximately fifteen (15) minutes earlier.

36.    Based on his knowledge that final decisionmaking authority regarding patient care was his, at the scheduled time Plaintiff began moving toward the location for the meeting with the patient; however, he was stopped by members of Defendant's nursing staff. Despite Plaintiff informing those nursing staff members that Johnson's directive was directly contrary to Defendant's policies and procedures, they refused to allow Plaintiff to perform his duties.

37.    Thereafter, Plaintiff was called into a meeting with Johnson, with f/n/u Richards, an administrative assistant, as a witness. The door was left open, and Johnson falsely stated both that she was unaware of any decision to refuse Plaintiff access to the patient and that she had just learned of it a few seconds earlier. Plaintiff

knew this to be a lie. Johnson then explained the reasoning behind the decision, such being that elective procedures are not permitted by Defendant. However, Plaintiff knew this to be false, as patients had been previously approved for elective procedures. Plaintiff subsequently reported to Johnson, in Lay's presence, that she had violated Defendant's policies and procedures; Lay responded that, "there is no policy, it is just common sense."

38.     Later that day, after Plaintiff had clocked out for the day, Johnson questioned if Plaintiff had finished his report--his report on the nursing staff member and on Vandermark, an advanced registered nurse practitioner ("ARNP")--to which Plaintiff responded in the negative, and that he would complete his report over the weekend. Johnson responded that her boss needed the report, and then called her supervisor and informed via speaker phone that Plaintiff would comply with company policy and provide the report as soon as he was able to. Plaintiff responded to Johnson, with her supervisor still listening by phone, that he would need to consult with the legal department before turning in any report.

39.     Immediately after Plaintiff mentioned having to consult with the legal department, Johnson's supervisor announced that Plaintiff was suspended pending further investigation.

40.     Prior to Plaintiff informing Johnson that he intended to seek legal counsel, Defendant had never mentioned any possible suspension.

41.     On October 20, 2017, Plaintiff received a call from Defendant notifying him that he was terminated based on allegations of his unproductivity, that he used profanity in the workplace, and that he had been violent in the workplace.  As stated above, female employees including Kent and Rister regularly used profanity with immunity and were certainly not fired for it.  Additionally, Plaintiff was not unproductive but his records were stolen or hidden from him and he had not been violent in the workplace.  These allegations were contrived.

42.     These reasons for Plaintiff's termination were clearly contrived by Defendant as an attempt to cover up the fact its actions against Plaintiff were actually motivated by the discriminatory practices of its decisionmaking employees and retaliation against Plaintiff for continuing to report these practices.

43.     In addition to the several complaints made by Plaintiff to his supervisors verbally and in writing throughout his employment with Defendant referenced in part above, Plaintiff also summarized these and several subsequent incidents of the mistreatment through his first EEOC charge filed in May 2017 which was referenced in his written incident report to Defendant dated October 13, 2017, wherein he referred to his earlier EEOC charge against Johnson for racial discrimination, supplemental EEOC technical assistance questionnaire and related documentation dated October 17, 2017, additional EEOC charges including that executed October 17, 2017 and supplemented with further documentation just days later.  Plaintiff

never hesitated to open himself to scrutiny by doing the right thing and reporting Defendant's violations, and he did so even after the system repeatedly failed him and was wrongfully terminated on October 20, 2017 as a result.

44.     Defendant did not terminate Plaintiff for any valid reason. Rather, Plaintiff was terminated because of his protected whistleblower activity in reporting violations of laws, rules and/or regulations, because of his national origin (Cuban), because of his actual or perceived disability and/or record of impairment and/or because of his reporting of discrimination including without limitation by filing a charge of discrimination.

45.     Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for his services. Defendant should be made to pay said fee, along with reasonable expenses incurred in connection with this action, under applicable law.

## COUNT I-PRIVATE EMPLOYEE WHISTLEBLOWER RETALIATION

46.     Paragraphs 1-6, 9-12, 15-17, 19-24, 26-28, 30-45 above are realleged incorporated.

47.     This count sets forth a claim of private employee whistleblower retaliation, and is brought under §448.101 *et seq.*, Fla.Stats.

48.     As set forth in greater detail above, while in Defendant's employ, Plaintiff objected to certain practices of Defendant that were in violation of laws, rules and/or regulations or that he reasonably and objectively believed were in violation of such laws, rules and/or regulations.

49.     After Plaintiff objected, Defendant terminated him.

50.     Plaintiff was terminated because he disclosed one or more activities, policies and/or practices of Defendant that were in violation of one or more laws, rules and/or regulations or that he reasonably and objectively believed were in violation thereof, and Plaintiff brought such activities, policies and/or practices to the attention of a supervisor and/or to the attention of Defendant, and afforded Defendant a reasonable opportunity to correct such activities, policies and/or practices, and/or objected to and/or refused to participate in one or more activities, policies and/or practices of Defendant which were in violation of one or more laws, rule and/or regulations and/or that he reasonably and objectively believed were in violation thereof.

51.     The disclosures made by Plaintiff are protected under §448.102, Fla.Stats.

52.     As a direct and proximate result Plaintiff's participation in the whistleblowing activities referenced above and Defendant's retaliation, Plaintiff has been damaged, which damages include but are not limited to emotional pain and

suffering, lost wages, other tangible and intangible damages, and should be awarded all compensatory damages allowed by law. These damages occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count, as well as to an award of punitive damages.

## COUNT II-NATIONAL ORIGIN-BASED DISCRIMINATION

53.     Paragraphs 1-6, 9-13, 15, 19-21, 23-29, 39-45 above are realleged and incorporated.

54.     This count sets forth a claim for discrimination based upon national origin, brought under Chapter 760, Fla.Stats.

55.     Plaintiff has been the victim of discrimination on the basis of his national origin in that he was treated differently than similarly situated employees of Defendant who were born and raised in the United States, and has been subjected to hostility and poor treatment on the basis, at least in part, of his national origin.

56.     Defendant is liable for the differential treatment and hostility toward Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff. Furthermore, Defendant knowingly condoned

and/or ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

57.    Defendant's known allowance and ratification of these actions and inactions actions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

58.    In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were based on Plaintiff's national origin and in violation of the laws set forth herein. The discrimination complained of herein affected the terms, conditions, and privileges of Plaintiff's continued employment by Defendant. The events set forth herein led, at least in part, to Plaintiff's termination on contrived allegations.

59.    Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon national origin in violation of Chapter 760, Fla.Stats.

60.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is

entitled to equitable/injunctive relief under this count, as well as to an award of punitive damages.

## COUNT III-DISABILITY-BASED DISCRIMINATION

61.     Paragraphs 1-15, 18, 20-21, 30-31, 33, 41-45 above are re alleged and incorporated.

62.     This count sets forth a claim for disability/perceived disability-based discrimination, brought under Chapter 760, Fla.Stats.

63.     Plaintiff has been the victim of discrimination on the basis of his disability or perceived disability. During the course of Plaintiff's employment by Defendant, he was treated differently than similarly situated non-disabled/perceived-as-disabled employees.

64.     Defendant is liable for the differential treatment and its refusal to accommodate Plaintiff, which adversely affected the terms and conditions of Plaintiff's employment by Defendant. Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

65.      In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were disability/perceived disability-based and in violation of the laws set forth herein.

20

66.     The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's continued employment by Defendant. The events set forth herein led, at least in part, to Plaintiff's termination.

67.     Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon Plaintiff's actual or perceived disability, or upon his record of having an impairment.

68.     As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count, along with an award of punitive damages.

## COUNT IV-RETALIATION

69.     Paragraphs 1-7, 9-15, 18-36, 39-45 above are re-alleged and incorporated.

70.     This count sets forth a claim for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting him under Chapter 760, Fla.Stats.

71.    The foregoing unlawful actions by Defendant were purposeful.

72.    Plaintiff voiced opposition to unlawful employment practices during his employment by Defendant and was the victim of retaliation thereafter, as related in part above. The events set forth herein led, at least in part, to Plaintiff's termination.

73.    Plaintiff is a member of a protected class because he reported unlawful employment practices and was the victim of retaliation thereafter. There was a causal connection between the reporting of the unlawful employment practices and the adverse employment actions taken thereafter.

74.    As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is entitled to equitable/injunctive relief under this count, as well as to an award of punitive damages.

**COUNT V-HOSTILE WORK ENVIRONMENT**

75.    Paragraphs 1-7. 9-21, 23-32, 36-40, 42-45 above are re-alleged and incorporated.

76.    This count sets forth a claim for hostile work environment based on Plaintiff's national origin and actual or perceived disability under Chapter 760,

Fla.Stats.

77.     Plaintiff has been subjected to a hostile work environment consisting of,

for example, targeted mistreatment in the form of slurs based on his Cuban heritage,

berating and belittlement by female coworkers that regularly went behind his back to

contrive false allegations against him which they knew to be particularly damaging

to Plaintiff's employment in that they affected his ability to do his job, and the

mocking of his actual or perceived disability in a manner of such severity to actually

exacerbate the symptoms of his impairments.

78.     During the course of Plaintiff's employment by Defendant, he was

subjected to this mistreatment based on his disability and national origin.  These

actions and events were severe and pervasive and adversely affected Plaintiff's

ability to perform his job.

79.     The foregoing unlawful actions by Defendant were purposeful.  The

hostility complained of herein affected terms, conditions, and privileges of Plaintiff's

continued employment by Defendant.

80.     Defendant's mistreatment of Plaintiff was severe, pervasive and affected

Plaintiff's ability to fulfill his job duties.  Defendant's actions and inactions against

Plaintiff led, at least in part, to Plaintiff's termination.

81.     As a direct and proximate result of the foregoing unlawful acts and

omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of

benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future. Plaintiff is entitled to equitable/injunctive relief under this count, as well as to an award of punitive damages.

**COUNT VI**
**GENDER DISCRIMINATION**

81.     Paragraphs 1-6, 9-15, 19-21, 23-27, 29, 32, 39-45 are re-alleged and incorporated herein by reference.

82.     This is an action against Defendant for discrimination based upon gender brought under Chapter 760, Florida Statutes.

83.     Plaintiff has been the victim of discrimination on the basis of his race in that he was treated differently than similarly situated white employees of Defendant and has been subject to poor treatment on the basis, at least in part, because of his gender.

84.     Defendant is liable for the differential treatment towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

85.     Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

86.     In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a gender-based nature and in violation of the laws set forth herein.

87.     The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.

88.     The events set forth herein led, at least in part, to the adverse action taken against Plaintiff including without limitation his termination.

89.     Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon gender in violation of Chapter 760, Florida Statutes.

90.     As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

    (a)    that process issue and this court take jurisdiction over this cause;

    (b)    that this Court enter judgment against Defendant and for Plaintiff awarding equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

    (c)    that this court enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages, including damages for economic loss, to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

    (d)    that this court enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

    (e)    that this court enter judgment against Defendant and for Plaintiff awarding Plaintiff costs and attorney's fees as allowed by law;

    (f)    that this court enter judgment against Defendant and for Plaintiff awarding Plaintiff interest and punitive damages where appropriate; and

(g)     that this court grant such other and further relief as is just and

proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all counsel of record by CM/ECF this 23rd day of December, 2019.

/s/ Marie A. Mattox
Marie A. Mattox